**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| In re,<br><br>Stacy's, Inc.,<br><br><br><br><br><br>Debtor. | Case No. 13-03600-dd<br><br>Chapter 11<br><br>**ORDER DENYING MOTION TO USE CASH COLLATERAL** |

This matter is before the Court on a motion to use cash collateral filed by the debtor, Stacy's Inc. ("Debtor"), on November 15, 2013. Bank of the West ("BOTW") objected to the motion. Debtor filed a supplement to its motion on December 19, 2013, which, although labeled as a supplement, includes other grounds for relief, more specifically requesting that BOTW's collateral be surcharged under 11 U.S.C. § 506(c). The Official Committee of Unsecured Creditors ("Committee") filed a response in support of Debtor's motion and supplement. After several continuances, due to inclement weather and other reasons, the Court held a hearing on March 12, 2014. Two days before the hearing, BOTW filed a supplement to its objection addressing the arguments raised in Debtor's supplement and filed a reply to the Committee's response in support of Debtor's motion.[1] While the United States Trustee did not file a formal response to Debtor's motion, it indicated its support for the motion at the hearing. After careful consideration of the applicable law, evidence submitted, and arguments of counsel, the Court

---

[1] The Court ordinarily disfavors a party's filing of responsive substantive briefing two days before a hearing on a motion and supplement that were pending for some time. However, such a filing may be fitting in this case considering Debtor, on the day before the evidentiary hearing on its motion to sell its assets free and clear, switched BOTW's claim from undisputed to disputed in its schedules and filed an adversary proceeding against BOTW in an effort to obtain approval of the sale over BOTW's objection. Additionally, the Committee filed a motion seeking approval to proceed with litigation against BOTW and others the day before the evidentiary hearing on the motion to sell free and clear.

1

issues the following finding of fact and conclusions of law under Federal Rule of Civil Procedure 52(a), made applicable by Federal Rule of Bankruptcy Procedure 9014.[2]

## FINDINGS OF FACT

Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code on June 21, 2013. Debtor's primary operation consisted of cultivating large quantities of plants and selling them wholesale to large retailers such as Wal-Mart, Home Depot, and Lowe's. The same day it filed its petition it also filed a motion seeking an order authorizing a sale of substantially all of its assets free and clear of liens, claims, encumbrances, and other interests pursuant to 11 U.S.C. § 363(f) ("Sale Motion"). In the Sale Motion, Debtor also sought authorization to sell free and clear of liens assets owned by entities related to Debtor, including the real property on which Debtor conducted most of its operations. The related entities did not file bankruptcy petitions. Debtor had an asset purchase agreement with a stalking horse bidder in place and planned to hold an auction on August 23, 2013, with the closing occurring on or before August 30, 2013.

BOTW is Debtor's largest secured creditor by far. Its security interest encumbers Debtor's accounts, chattel paper, inventory, equipment, fixtures, farm products, water rights, instruments, investment property, documents, commercial tort claims, deposit accounts, letter of credit rights, general intangibles, supporting obligations, and records of, accession to and proceeds and products of the foregoing. BOTW also had a first mortgage on the real property owned by entities related to Debtor where Debtor conducted most of its operations. Debtor did

---

[2] To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such, and to the extent any of the following conclusions of law constitute findings of fact, they are also so adopted.

2

not negotiate with BOTW regarding the prospect of selling its assets through a bankruptcy sale or notify BOTW of its plans prior to filing bankruptcy.

BOTW objected to the Sale Motion, and the Court held an evidentiary hearing on August 12, 2013. One of the major disputes between the parties was regarding a carve-out from the sale proceeds for payment of allowed general unsecured claims and allowed 11 U.S.C. § 503(b) administrative expense claims. Until the day before the hearing, Debtor listed BOTW's claim as undisputed on its schedules. On August 11, 2013, Debtor amended its schedules to list BOTW's claim as disputed and filed an adversary proceeding against BOTW in an effort to obtain Court approval of the sale over BOTW's objection pursuant to 11 U.S.C. § 363(f)(4). Debtor included in the complaint initiating the adversary proceeding a cause of action for surcharge of BOTW's collateral under 11 U.S.C. § 506(c). Coincidentally, the Committee, on August 11, 2013, filed a motion seeking authorization to proceed with litigation on behalf of Debtor against BOTW and others.

At the conclusion of the August 12th hearing, the Court took the matter under advisement. While prepared to issue its ruling two days after the hearing, the Court delayed ruling at the request of Debtor, the Committee, and BOTW to allow the parties more time to negotiate a consensual sale, which the parties did. On August 21, 2013, the Court entered a consent order authorizing the sale of Debtor's assets, which was signed by Debtor, BOTW, and the Committee. Among the terms in the consent order was a carve-out from the sale proceeds of $950,000 for allowed administrative expense claims, a $450,000 carve-out for allowed general unsecured claims, an agreement by Debtor to promptly dismiss with prejudice its adversary proceeding against BOTW, and an agreement by the Committee to amend its August 11, 2013

motion to reflect it was no longer seeking authorization to pursue litigation against BOTW. The consent order also contained a release of BOTW by Debtor and the Committee:

> Upon entry of this Order, the Debtor, the Committee and its members grant BOTW a full and general release of any and all claims of every type, kind, nature, description or character, whether known or unknown, suspected or unsuspected, liquidated or unliquidated, that the Debtor, the Committee and its members now have or may acquire as of the date of this Order related to the loans made by BOTW to the Debtor and the Trust, and the Debtor and Committee shall include a full and general release of BOTW by the creditors claiming through the bankruptcy estate in any plan of liquidation filed by the Debtor, the Committee or a liquidating trust in this case.

Finally, the consent order provided that BOTW would have an allowed secured claim in the "maximum amount" of $22,580,896.87. There were no competing bidders at the auction scheduled for August 23, 2013, and on August 26, 2013, the Court entered an order approving the sale of assets to the stalking horse bidder, MG Acquisition, Inc ("MG").[3] The sale closed on August 30, 2013. Debtor filed a notice of voluntary dismissal with prejudice of its adversary proceeding against BOTW on August 27, 2013. The Committee amended its motion on August 22, 2013.

In its motion for use of cash collateral filed November 15, 2013, Debtor seeks to use BOTW's cash collateral to pay the following expenses:

1. Approximately $525,000 in income taxes as a result of income generated through August 30, 2013 based on a tax analysis dated February 10, 2014 (Debtor's ex. B-4);

2. $33,000 in independent contractor wages for two officers employed by Stacy's until the sale of its assets for services performed in winding down the company after the sale;

---

[3] MG is affiliated with Metrolina Greenhouses, Inc.

3. $2,472.33 owed to Debtor's worker's compensation insurance carrier as a result of an audit conducted by the carrier following the termination of the policy on August 30, 2013; and

4. Approximately $31,000 in U.S. Trustee fees for the fourth quarter of 2013 through the projected closing of this case.

In the supplement to its motion filed December 19, 2013, Debtor seeks, in addition to the above expenses, to use BOTW's cash collateral to pay approximately $10,000 in fees for termination of its 401k plan and $5,000 for a computer consultant. The computer consultant was involved with storing the data on the computers and related equipment formerly owned by Debtor but now owned by MG. At the hearing on March 12, 2014, Debtor indicated, in addition to the above, it was seeking to use cash collateral to pay $6,055.96 in federal unemployment taxes. Debtor's ex. A. Tim Brindley, who was Debtor's president until the sale of substantially all of Debtor's assets to MG, testified the unemployment taxes have been paid with unencumbered assets. The primary focus of the parties in their briefing and at the hearing was on the $525,000 estimated income tax liability. The tax liability is the result of more money being collected post-petition than anticipated, lower expenses than expected, and a higher working capital adjustment defined below.

The asset purchase agreement ("APA") under which Debtor sold its assets contained a requirement that Debtor have at least $11.5 million in working capital at closing. Working capital consisted of inventory and accounts receivable. The APA referred to the amount by which the working capital exceeds $11.5 million as the "working capital adjustment." The purchase price under the APA was adjusted upward based on the working capital adjustment. Brindley and Debtor's counsel indicated at the August 12, 2013 hearing that the working capital

5

adjustment might be as much as $2 million. Transcript of August 12, 2013 hearing, docket entry 178, pp. 17, 21, 110, 148. Debtor's accountant and financial advisor, Marty Ouzts, testified at the March 12, 2014 hearing that shortly before the closing on August 30, 2013, there was concern expressed by BOTW's representatives involved with the inventorying of Debtor's working capital during the week preceding the closing that Debtor would not have the $11.5 million working capital minimum required under the APA. At the time of closing, the working capital adjustment was calculated to be $300,000. Following the closing, the working capital adjustment was amended upward to $585,006. Brindley, in his capacity as Debtor's president, signed a letter, dated September 27, 2013, directing the $585,006 constituting the working capital adjustment be transferred to BOTW by MG. Debtor's ex. J.

In order to fund its operations during this bankruptcy until the sale of its assets, Debtor sought and obtained authorization to use BOTW's cash collateral consisting of the proceeds of inventory and accounts receivable. In its cash collateral motion at the outset of the case, Debtor projected having $2,554,413 in cash collateral on August 30, 2013. On June 26, 2013, the Court entered an interim order authorizing Debtor's use of cash collateral consistent with a budget attached to the Order. Subsequent consent cash collateral orders were entered on July 17, 2013; August 2, 2013; and August 15, 2013. The August 15th Order authorized Debtor's use of cash collateral through August 30, 2013. The budget attached to the August 15th Order prepared by Debtor projected cash collateral of $5,513,534 as of August 30, 2013. This budget also reflected Debtor exceeded its projections for the amount of cash collateral that would exist as of July 26, 2013, and August 9, 2013.[4] The actual amount of cash collateral on August 30, 2013, ended up being $6,478,434. Pl.'s ex. D. Brindley testified there was no way of knowing on August 12,

---

[4] The budget attached to the August 15th Order contains a notation stating Debtor was experiencing "higher sales post petition than anticipated."

6

2013, which was date of the evidentiary hearing on the Sale Motion and the last cash collateral hearing, that Debtor's sales would exceed projections looking forward to August 30th by $1 million.

Ouzts prepared a tax analysis for Debtor at the start of this bankruptcy, projecting there would no income tax liability. Debtor's ex. B-1. He prepared another tax analysis on July 18, 2013, again projecting no income taxes would be owed based on there being accounts receivable and inventory of $11.5 million on August 30, 2013. Debtor's ex. B-2. Debtor's financial consultant did not conduct another tax analysis until September of 2013. Debtor did not consult with him in connection with the negotiations with BOTW regarding the administrative carve-out and he did not know the carve-out was $950,000 until after the Court entered the August 21, 2013 consent order. Ouzts indicated he would not have projected income tax liability even if he had done a tax analysis contemporaneously with the August 21, 2013 consent order.

On July 22, 2013, Ouzts sent an email to BOTW's financial advisor projecting accounts receivable of $1.7 million and inventory of $11.5 million as of August 30th. BOTW's ex. 4. If these numbers in the July 22, 2013 email are used in the July 18, 2013 tax analysis, potential taxable income is $65,251. If the $13.5 million working capital figure suggested at the August 12, 2013 hearing is plugged into the July 18th tax analysis, potential taxable income is $365,251. BOTW's financial consultant, Thomas Plumb, testified with respect to what a tax analysis done on August 15, 2013 might have shown. *See* BOTW's ex. 8-D. This analysis used the $5,513,534 cash collateral projection for August 30th contained in the August 15th cash collateral budget and the inventory and accounts receivable numbers contained in the July 22, 2013 email. *Id.* Plumb intended for the "Gain/Loss Fixed Assets" and "NOL Carry-Over" numbers to be the same as those appearing in Ouzts' July 18th tax analysis. However, when

7

Ouzts emailed his July 18th tax analysis to BOTW's counsel in December of 2013, he had to recreate his July 18th tax analysis because he did not save a copy of it when it was originally created. In recreating the tax analysis, he mistakenly used different "Gain/Loss Fixed Assets" and "NOL Carry-Over" figures than the projections for these figures that appear in his actual July 18th tax analysis. *Compare* BOTW's ex. 5, *with* Debtor's ex. B-2. If the correct figures are used in Plumb's hypothetical August 15, 2013 tax analysis, potential taxable income amounts to $1,504,200.

At the March 12, 2014 hearing, Ouzts attempted to quantify how BOTW benefited from Debtor's assets being sold through this bankruptcy while it still operated as opposed to if Debtor's assets had been liquidated through a state court proceeding. He did so through a spreadsheet that constitutes Debtor's exhibit O. He testified his opinion was BOTW benefited from this bankruptcy. Brindley also testified he believed BOTW benefited from Debtor's continuing operations during this bankruptcy as opposed to closure of the business.

As of March 7, 2014, BOTW had received $19,289,461 during this bankruptcy toward its allowed secured claim. Although in its motion and supplement Debtor questioned whether the funds it is seeking authorization to use are BOTW's cash collateral, Debtor did not pursue this argument at the hearing. Therefore, it is undisputed the funds Debtor is seeking to use are BOTW's cash collateral.[5]

---

[5] For purposes of 11 U.S.C. § 363, "'cash collateral' means cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title." 11 U.S.C. § 363(a).

## CONCLUSIONS OF LAW

**I. Request for authorization to use cash collateral**

Under 11 U.S.C. § 363(c)(2), Debtor "may not use, sell, or lease cash collateral . . . unless (A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." Pursuant to section 363(e), "at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." Debtor has the burden of proof on the issue of adequate protection. *See* 11 U.S.C. § 363(p)(1).

In asserting the Court should authorize the use of cash collateral over BOTW's objection, Debtor relies almost exclusively on the analysis of the United States Bankruptcy Court for the Eastern District of Virginia in *In re JKJ Chevrolet, Inc.*, 190 B.R. 542 (Bankr. E.D. Va. 1995). This case involved an order by the bankruptcy court that the creditor pay commissions, salaries, and other benefits to former employees of the debtor for work they performed during the debtor's bankruptcy. The Fourth Circuit in an unpublished opinion held it was not necessary to address the bankruptcy court's conclusions regarding adequate protection because the objecting creditor in that case consented to the use of its cash collateral to pay post-petition wages of the debtor's employees. *Ford Motor Credit Co. v. JKJ Chevrolet, Inc.* (*In re JKJ Chevrolet, Inc.*), 117 F.3d 1413, 1997 WL 407827, at *2-3 (4th Cir. 1997) (per curiam). With respect to the adequate protection issue, the Fourth Circuit noted that the creditor would have received "nothing in return" if compelled to pay the wages. *Id*. at *2. This Court declines to apply the analysis of adequate protection set forth by the bankruptcy court in *JKJ Chevrolet* because the

9

facts are dissimilar.  Consequently, Debtor has not met its burden of proving adequate protection exists for the $612,528.30 in cash collateral it seeks authorization to use.

**II. Surcharge**

In its supplement, Debtor argues BOTW's collateral should be surcharged for the expenses described in its motion, supplement, and at the hearing.  Again, the primary focus of the parties is the income tax liability.  The general rule is that "administrative expenses are paid from the unencumbered assets of a bankruptcy estate rather than from secured collateral."  *Ford Motor Credit Co. v. Reynolds & Reynolds Co.* (*In re JKJ Chevrolet, Inc.*), 26 F.3d 481, 483 (4th Cir. 1994).  Administrative expenses include "the actual, necessary costs and expenses of preserving the estate" and "any tax . . . incurred by the estate" with one exception not applicable here.  11 U.S.C. § 503(b).  Section 506(c) of the Bankruptcy Code "provides an exception to this general rule."  *Ford Motor Credit Co. v. Reynolds & Reynolds Co.* (*In re JKJ Chevrolet, Inc.*), 26 F.3d 481, 483 (4th Cir. 1994).  Pursuant to section 506(c), "[t]he trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim, including the payment of all ad valorem property taxes with respect to the property."  11 U.S.C. § 506(c).  "The purpose of [section 506(c)] is to prevent a windfall to a secured creditor at the expense of the estate."  *Ford Motor Credit Co. v. Reynolds & Reynolds Co.* (*In re JKJ Chevrolet, Inc.*), 26 F.3d 481, 483 (4th Cir. 1994).

BOTW asserts Debtor's surcharge claim is precluded by res judicata based on Debtor's inclusion of a surcharge cause of action in the adversary proceeding filed with this Court the day before the August 12, 2013 evidentiary hearing on the Sale Motion.  In connection with its

surcharge claim in the adversary proceeding, Debtor alleged its "expenditures in connection with the bankruptcy cash flow and anticipated sale have provided a direct and substantial benefit to [BOTW]" and that it was "entitled to surcharge [BOTW]'s collateral or the proceeds resulting from the sale of [BOTW]'s collateral for the reasonable, necessary costs and expenses of preserving, or disposing of, such collateral." Adv. Pro. No. 13-80135-dd, docket entry 1, p. 11. As part of the August 21, 2013 consent order in which BOTW consented to the sale to MG of substantially all of Debtor's assets, BOTW agreed to a $950,000 carve-out for section 503(b) administrative expenses and Debtor agreed to dismiss the adversary proceeding with prejudice. Debtor filed a notice of dismissal with prejudice in the adversary proceeding on August 27, 2013, four days before the sale to MG closed.

Because the adversary proceeding against BOTW was filed and finally decided in a federal forum, this Court applies federal common law in assessing the preclusive effect of the dismissal of that adversary proceeding with prejudice. *Taylor v. Sturgell*, 553 U.S. 880, 891 (2008). Under federal common law, generally "a judgment is res judicata not only as to all matters litigated and decided by it, but as to all relevant issues which could have been but were not raised and litigated in the suit." *Heiser v. Woodruff*, 327 U.S. 726, 735 (1946). Res judicata, also known as claim preclusion, occurs when three conditions are satisfied: "1) the prior judgment was final and on the merits, and rendered by a court of competent jurisdiction in accordance with the requirements of due process; 2) the parties are identical, or in privity, in the two actions; and, 3) the claims in the second matter are based upon the same cause of action involved in the earlier proceeding." *First Union Commercial Corp. v. Nelson, Mullins, Riley & Scarborough* (*In re Varat Enter., Inc.*), 81 F.3d 1310, 1315 (4th Cir. 1996). Conditions one and two are satisfied here because the dismissal of the adversary proceeding was with prejudice and

11

the parties to this dispute are the same as the parties in the adversary proceeding. The fact that the Committee and the U.S. Trustee support Debtor's motion does not affect this analysis because only a trustee is empowered to invoke section 506(c). *See Hartford Underwriters Ins. Co. v. Union Planters Bank*, 530 U.S. 1, 6 (2000). As a debtor-in-possession with many of the same powers as a trustee, Debtor also may utilize section 506(c). *Id.* at 6 n.3 (citing 11 U.S.C. § 1107). With respect to condition three, "[g]enerally, claims are part of the same cause of action when they arise out of the same transaction or series of transactions . . . or the same core of operative facts." *First Union*, 81 F.3d at 1316 (citations omitted).[6] "Actual knowledge of a potential claim is not a requirement for application of the rules of merger and bar." *Harnett v. Billman*, 800 F.2d 1308, 1313 (4th Cir. 1986). "For purposes of res judicata, it is not necessary to ask if [a party] knew of [its] present claim at the time of the former judgment, for it is the existence of the present claim, not party awareness of it, that controls." *Id.* Furthermore, "[c]laims may arise out of the same transaction or series of transactions even if they involve different harms or different theories or measures of relief." *Id.* (citing Restatement (Second) of Judgments § 24, cmt. c).

Debtor sought to surcharge BOTW's collateral for the costs and expenses of preserving or disposing of its collateral as part of the adversary proceeding it filed and dismissed with prejudice. In consenting to a sale of its collateral to MG, BOTW agreed to a $950,000 carve-out

---

[6] *See also* Restatement (Second) of Judgments § 24 ("(1) When a valid and final judgment rendered in an action extinguishes the plaintiff's claim pursuant to the rules of merger or bar . . . , the claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose. (2) What factual grouping constitutes a 'transaction,' and what groupings constitute a 'series,' are to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.").

for section 503(b) administrative expenses, and income taxes incurred during a bankruptcy are ordinarily treated as a section 503(b) administrative expense. Part of what BOTW received in exchange for the $950,000 administrative carve-out was a dismissal of the adversary proceeding against it with prejudice. Debtor is now again seeking to surcharge BOTW's collateral, essentially attempting to renegotiate the administrative carve-out because the $950,000 is not enough. While Debtor asserts it did not know about the expenses it seeks to surcharge at the time the adversary proceeding was filed and dismissed, actual knowledge of a potential claim is not a requirement for applying res judicata. *Harnett*, 800 F.2d 1308 at 1313. Nonetheless and first with respect to the expenses Debtor seeks to surcharge other than the income tax liability, Debtor knew or should have known these expenses potentially could arise and need to be paid as part of this bankruptcy. As for the income tax liability which Debtor asserts comes as a complete surprise, Debtor knew that income taxes incurred as a result of its operations while in bankruptcy are normally treated as an administrative expense under section 503(b). Furthermore, Debtor knew on August 11, 2013, when it filed the adversary proceeding, that its business was performing better than expected and it was accruing more cash collateral than projected. *See* Debtor's ex. C-5. Additionally, Debtor represented at the hearing the following day that it believed the working capital adjustment might be $2 million. *See* Transcript of August 12, 2013 hearing, docket entry 178, pp. 17, 21, 110, 148. Debtor's asserted lack of knowledge does not alter the Court's conclusion that res judicata bars the surcharge claim before it.

    Even if res judicata did not apply, section 506(c) only allows a trustee to recover the reasonable, necessary costs and expenses of preserving, or disposing of, a secured party's collateral. 11 U.S.C. § 506(c). One treatise has listed the types of expenses that may qualify for surcharge under section 506(c) as including "appraisal fees, auctioneer fees, advertising costs,

13

moving expenses, storage charges, payroll of employees directly and solely involved with the disposition of the subject property, maintenance and repair costs, and marketing costs."[7] 4 *Collier on Bankruptcy* § 506.06[4] (16th ed.). As the Third Circuit has noted, "[a]ll of these expenditures share a common characteristic: they are expenses directly related to disposing of or preserving the creditor's collateral." *Visual Indus.*, 57 F.3d at 325. Debtor does not identify the specific property for which it asserts the income taxes at issue should be considered an expense of preserving or disposing. Presumably, it is the inventory sold and accounts receivable collected that resulted in the cash collateral Debtor seeks to use. Because Debtor was selling inventory and converting accounts receivable into cash, the income taxes would not constitute an expense of preserving inventory and accounts receivable. As for whether it constitutes an expense of disposing of this property, the income taxes at issue arose, in part, from the income received in exchange for the inventory sold. Thus, the income taxes are not an expense incurred in the process of disposing of inventory, as the income taxes arose from the income received after the disposing occurred. This relationship between the disposing of inventory and the income taxes is not sufficiently direct to fall within the scope of section 506(c).

Finally, while the Eighth Circuit has held that the benefit for purposes of section 506(c) can be general in nature, *see United States v. Boatmen's First Nat'l Bank of Kansas City*, 5 F.3d

---

[7] This same treatise also states that "if a creditor has a lien on all, or virtually all, of a debtor's assets, the debtor is engaged in ongoing business operations, and the debtor's continued operations preserve or enhance the value of the secured creditor's collateral, items that may qualify as 'necessary' expenses chargeable against the collateral include the debtor's payroll costs, insurance costs, workers' compensation expenses, and postpetition administrative taxes." 4 *Collier on Bankruptcy* § 506.06[4] (16th ed.). However, the only authority cited in support of this proposition is a case where an insurance company was seeking to recover unpaid workers' compensation premiums and the opponent of the surcharge had consented to the debtor's "use of its cash collateral for necessary operating expenses, which specifically included workers' compensation insurance premiums . . . ." *See Hartford Underwriters Ins. Co. v. Magna Bank, N.A.* (*In re Hen House Interstate, Inc.*), 150 F.3d 868, 872 (8th Cir. 1998), *rev'd on other grounds*, 177 F.3d 719 (8th Cir. 1999) (en banc).

14

1157, 1160 (8th Cir. 1993), *overruled on other grounds by Hartford Underwriters Ins. Co. v. Magna Bank, N.A.* (*In re Hen House Interstate, Inc.*), 177 F.3d 719, 721 (8th Cir. 1999), the Fourth Circuit's requirement of a "direct and quantifiable benefit" is more analogous to the approach taken by other circuits, *Compare Loudon Leasing Dev. Co. v. Ford Motor Credit Co.* (*In re K & L Lakeland, Inc.*), 128 F.3d 203, 211 (4th Cir. 1997), *with Precision Steel Shearing, Inc. v. Fremont Fin. Corp.* (*In re Visual Indus., Inc.*), 57 F.3d 321, 325-28 (3d Cir. 1995); *Cent. Bank of Mont. v. Cascade Hydraulics & Util. Serv.* (*In re Cascade Hydraulics & Util. Serv.*), 815 F.2d 546, 548 (9th Cir. 1987); *and Gen. Elec. Credit Corp. v. Peltz* (*In re Flagstaff Foodservice Corp.*), 762 F.2d 10, 12 (2d Cir. 1985). It is questionable as to whether Debtor made the required showing of a direct and quantifiable benefit.[8] Although Debtor attempted to make such a showing through Ouzts' testimony with respect to its exhibit O, what exactly exhibit O represents and the methodology behind it is unclear.[9]

### III. Equities of the case exception

Pursuant to 11 U.S.C. § 552(b)(1), with certain exceptions, "if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, products, offspring, or profits of such property, then such security interest extends to such proceeds, products, offspring, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and

---

[8] The Court notes a requirement that the proponent of a surcharge be able to quantify the benefit could foreclose some expenses that might typically be considered proper subjects of a surcharge such as placing a lock on an otherwise unsecured building.

[9] Exhibit O was admitted over BOTW's objection. BOTW's counsel did not cross-examine Ouzts regarding exhibit O. BOTW's counsel also did not object to Brindley offering an opinion about whether BOTW benefited from Debtor's assets being sold during this bankruptcy while it was still operating.

by applicable nonbankruptcy law, *except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise*." Emphasis added. While Debtor did not reference the equities of the case exception in its motion or supplement, the Committee asserts the exception in its response in support of Debtor's motion. Therefore, the Court addresses it here.

In applying the equities of the case exception, courts place significant weight "on whether a debtor expended unencumbered funds of the estate, at the expense of the unsecured creditors, to enhance the value of the collateral." *All Points Capital Corp. v. Laurel Hill Paper Co.* (*In re Laurel Hill Paper Co.*), 393 B.R. 89, 93 (Bankr. M.D.N.C. 2008); *see also Stanzale v. Finova Capital Corp.* (*In re Tower Air, Inc.*), 397 F.3d 191, 205 (3d Cir. 2005); *Marine Midland Bank v. Breeden* (*In re the Bennett Funding Group, Inc.*), 255 B.R. 616, 634 (N.D.N.Y. 2000); *In re Muma Serv.*, 322 B.R. 541, 558-59 (Bankr. D. Del. 2005). No evidence has been presented establishing that Debtor used unencumbered assets post-petition to increase the value of BOTW's collateral. Rather, it "was only through the use of [BOTW]'s cash collateral . . . that the estate was able to continue to operate." *Muma Serv.*, 322 B.R. at 559. BOTW already has agreed to carve-outs from the proceeds of its collateral totaling $1,400,000 for administrative expenses and unsecured creditors. After careful consideration, the Court does not find it appropriate to apply the equities of the case exception under the circumstances before it to in effect further reduce BOTW's collateral beyond the carve-outs to which it agreed.

**CONCLUSION**

For the reasons set forth herein, Debtor's motion to use cash collateral is denied.

AND IT IS SO ORDERED.

**FILED BY THE COURT**
**04/04/2014**



Entered: 04/04/2014

David R. Duncan
Chief US Bankruptcy Judge
District of South Carolina